J-S13026-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH ALLEN MILLER | : | |
| | : | |
| Appellant | : | No. 1692 MDA 2024 |

Appeal from the PCRA Order Entered October 28, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0002503-2017

BEFORE:  PANELLA, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: JULY 16, 2025**

Joseph Allen Miller appeals from the order dismissing his first, timely petition under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541– 9546.  This case returns to us following a remand for an evidentiary hearing on prior PCRA counsel's effectiveness.  Miller presents five issues about the stewardship of his trial counsel and prior PCRA counsel and the PCRA court's analysis of his issues.  We affirm.

On January 10, 2017, police charged Miller, then 34 years old, with involuntary deviate sexual intercourse, attempted aggravated indecent assault, and other crimes.  The allegations stemmed from an incident with Miller's relative K.M., who was 15 years old at the time of the incident.  The case proceeded to a jury trial on February 12 to 14, 2020.  Christopher Sarno (trial counsel) represented Miller.

At trial, K.M. testified that Miller added her as a friend on Facebook, "a social media app," in May of 2016. The Commonwealth presented Facebook messages sent between Miller and K.M. beginning May 23, 2016, to the jury. In the messages, Miller introduced himself to K.M.; the conversation was not sexual. The next day, Miller gave K.M. his cell phone number, and the two began sending text messages "pretty much every single day all throughout the day," with limited exception.

According to K.M., Miller's text messages became inappropriate and sexual the "very first day that we were talkin'," May 24, 2016. She explained:

> We were, like, taking little shots at each other, like, jokes and stuff like that, just making fun of each other. And then he said that he wished I was in arm length's reach of him. And then he just kept sayin' stuff like that.
>
> And I was, like: Well, what do you mean?
>
> And then it became sexual. And he was, like: I'd shove your face in a pillow.
>
> And I was, like: Wow, suffocating. That's nice.
>
> And then he was, like: It'd be there for other reasons than suffocating.
>
> And that's how it started.

N.T., 2/12/20–2/14/20, at 50–51 (verbatim).

K.M. clarified that before the messages became sexual, she told Miller that she was 15, and he said she was "a young cub." She testified that at first, she "wasn't talking sexual back to" Miller, but eventually, she felt like she needed to because it seemed like that was what he wanted. Through the exchanges, K.M. developed feelings for Miller. Although they would send text

messages any time they were both awake, Miller occasionally did not respond for periods of a few days or weeks at a time.

Notably, K.M. stated that in July of 2016, her grandmother took away her phone. She testified that she deleted all the text messages she had with Miller until that point because she was concerned that her grandmother would see them. On July 21, 2016, K.M. warned Miller in a Facebook message:

> Hey I might not be able to see you Sunday. My grandma just kicked me out so I'm staying with my brother Justin for a while. And she has my phone so I probably won't be talking for a little bit. Anyways I'll let you know if I can see you and I'll talk to you when I can. I love you.

*Id.* at 58.

A few days later, testified K.M., she got her phone back and resumed text messaging with Miller. The conversation "just picked right back up where it left off." According to K.M., Miller sent her nude pictures of his genitals; although K.M. never sent nude pictures to Miller, she sent other photographs of herself. The Commonwealth presented the pictures to the jury.

K.M. testified that she and Miller agreed to meet in person several times that fell through. On November 12, 2016, the two again planned to meet. That afternoon, Miller arrived at K.M.'s house and spoke to her grandmother. K.M. explained that she and Miller got in Miller's truck, smoked a few bowls, and drove to a room at the Inn of the Dove[1] in Harrisburg. She testified that

---

[1] The parties stipulated that the owner of the inn would testify that Room 114 was rented on November 12, 2016, for a four-hour increment under the name of Joseph Miller, who requested the room be listed as discreet.

Miller went to the lobby to check in, then he took her to a room around the back. They again smoked marijuana, and Miller flipped through TV channels.

K.M. then testified that she got on the bed next to Miller, who rubbed her body over her clothes and undid her pants once she "didn't want to fight with him about it anymore." According to K.M., Miller kissed her neck, chest, and stomach before pulling off her underwear and putting his tongue in her vagina. K.M. testified that Miller also tried to put his fingers inside her vagina. She said that Miller put her hand on his penis, but she pulled her hand away, so Miller "just did it himself" and ejaculated on her stomach. K.M. testified that Miller then gave her a towel, and she cleaned herself up and got dressed.

After the inn, K.M. testified, Miller drove her back home and said not to act suspicious because she had a hickey on her neck. Although K.M. sent text messages to Miller, he "was pretty distant," and then stopped talking to her. K.M. testified that she expressed to Miller that she felt suicidal; Miller replied with concern for himself. Ultimately, K.M. told her uncle and her brother about Miller; K.M.'s brother contacted the police.

Trial counsel cross-examined K.M. about details of her testimony. K.M. denied that Miller took her to eat at Arby's. She acknowledged that she had previously stated that she had to take off her belt because Miller could not. K.M. maintained that Miller was somehow able to "get underneath" the three shirts that she wore during the entire encounter. K.M. agreed that everything was consensual, although Miller would "revisit" what she told him not to do. K.M. stated that in 2016, her hair was not covering her neck, where she

claimed Miller gave her a hickey. Trial counsel questioned K.M. about the Facebook messages (whether K.M. previously knew Miller) and text messages (whether, after November 12, 2016, Miller was concerned only for himself). However, trial counsel did not question K.M. about deleting text messages from May to July of 2016.

On the second day of trial, the Commonwealth presented testimony from Robert J. Soop, an expert in cell phone forensics. Agent Soop testified that he performed a consensual search of K.M.'s phone, for text messages with Miller's number. The search yielded 3486 SMS (short message service) and 7 MMS (multimedia message) messages between the two numbers, none of which were reported to be deleted. The earliest SMS message recovered was from July 26, 2016, and the latest was from December 27, 2016. Agent Soop testified that this was consistent with K.M.'s statement that she deleted the earlier messages. He stated that recovering deleted data "can be more difficult on an Apple device" like K.M.'s iPhone. The Commonwealth entered Agent Soop's report into evidence.

Susquehanna Township Police Corporal Lee Tarasi, the detective who filed charges, testified to the history of the case and discovery of the text messages between Miller and K.M. Detective Tarasi read particular text messages, from before and after November 12, 2016, to the jury. In the buildup to the incident, Miller and K.M. explicitly discussed sexual acts and getting a room. K.M. and Miller then coordinated Miller's arrival at K.M.'s house. There were no text messages between 1:44 p.m. and 5:58 p.m. on

November 12, 2016, when K.M. had testified Miller took her to the Inn of the Dove. Detective Tarasi read the messages from after the encounter:

A. . . . So she reaches out to him and says, "Hey".

He replies and says, "Hi!"

And she says, "We're ok".

He says, "Good! :)"

"U ok".

She replies, "Yeah".

"Are you"?

He says, "Yeah I'm ok :)"

She says, "I hope to see you again soon".

He says, "Promise u will,!!!!"

        \*     \*     \*

. . . She replies, "Good!!"

"Babe apparently my neck isn't the only place you left a hickey".

He says, "What???"

[She says,] "You also left one on the inside of my thigh".

He says, "Really??????"

She says, "Yes!!!"

He says, "Ugh!!!"

N.T., 2/12/20–2/14/20, at 193–94.

The next day, K.M. asked to talk, and Miller expressed concern that there were "legal issues" or that something was "noticed":

[K.M. said,] "Uhm actually we need to have a chat later".

He says, "Don't do that to me, a chat about what?????"

"It's not fair at all to put THAT thought in my head".

She replies, "We'll talk later ok?"

He says, "Are u serious right now??????   Do I need to worry??????"

"???"

She states, "We will talk later?  Just don't think about it till later".

He replies, "Listen to me, u know as well as I do that letting it like that is only making it worse!!!!!  U know fuckin well I wouldn't do something like that to u!!"

She says, "Joe don't worry about it ok"?

[Miller] says, "I want the words from ur mouth [K.M.]!! Legal issues??????"

[K.M.] says, "No".

"Nothing like that".

He replies, "Swear????????"

She says, "Yes".

He says, "Was something noticed???"

She says, "No".

N.T., 2/12/20–2/14/20, at 194–95.

The two discussed the future of their relationship and opening up.  From November 20, 2016, to December 17, 2016, Miller did not send any text messages in response to K.M.  Then, K.M. said, "I need help," and Miller asked her to elaborate.  Eventually, Miller expressed that he did not want to lose his children, and he suggested that he would kill himself instead.

> [Miller] says, "What does that have to do with not being able to call me?"

He says, "[K.M.], u really want me to lose my kids??? Like seriously???"

[K.M.] responds, "Because I don't want to talk to you about this in public".

"You really think I want that?"

[Miller] replies, "Well that's what will happen".

[K.M.] says, "Who the fuck do you think I am"?

[Miller] says, "I'll shoot myself!!!!!"

She says, "I know!!! Ok I know".

He says, "No way I'm going through this n losing my kids".

"Yeah ok".

[K.M.] replies, "Don't say that".

[Miller] says, "I told u, I'll help u any way I can as long as ur willing to actually tell me what's wrong. Swear on everything I love in this world, the day I get the knock on the door will be my last day."

[K.M.] replies, "So basically is you die or I do".

[Miller] says, "Not at all. I'm simply saying I won't lose my kids like that, I'll die before I lose them like that."

"Fine what?"

She says, "Fine".

He replies, "I can't sit here blind to what is happening, I have to go down there".

[K.M.] says, "No".

"And everything is fine."

"Ok?"

[Miller] says, "I have to [K.M.], I'll lose everything... My house, 2 boys, my business, my friends, everything I have in life... I need to know what's going to happen to me".

N.T., 2/12/20–2/14/20, at 210–11. In the text messages, Miller indicated that he would shoot himself rather than "go to jail." *Id.* at 212.

Trial counsel cross-examined Detective Tarasi, exploring inconsistencies between a police report she wrote and K.M.'s trial testimony. However, trial counsel did not ask Detective Tarasi about whether she had observed the text messages from May to July of 2016 when she looked at K.M.'s phone.

Miller elected not to testify at trial. The trial court confirmed that Miller had an opportunity to discuss his decision with trial counsel and others. The defense rested without presenting additional witnesses. The jury found Miller guilty as charged.

On September 2, 2020, the trial court sentenced Miller to an aggregate term of 10 to 20 years of imprisonment with 4 years of consecutive probation. Miller thereafter retained Attorney Kristen Weisenberger (prior PCRA counsel), who filed post-sentence motions. The trial court denied the motions. Miller did not appeal.

On March 30, 2021, Miller, through prior PCRA counsel, filed a timely PCRA petition. The petition alleged that trial counsel was ineffective (1) for failing to prepare for trial, (2) which forced Miller not to testify, (3) for failing to file a motion *in limine* to exclude Miller's criminal history for impeachment purposes, and (4) for failing to call character witnesses. The petition identified eight character witnesses who "were all available and willing to testify." The Commonwealth filed an answer on May 14, 2021.

The PCRA court first heard Miller's petition on July 7, 2021. Miller testified that he initially consulted trial counsel in February or March of 2019 and had one other in-person meeting on October 17, 2019. Miller stated he also communicated with trial counsel by e-mail. Miller maintained that trial counsel never discussed the case facts, text messages, or the right to testify with him. Notably, Miller testified that he e-mailed trial counsel "pretty early" on February 14, 2020 (the day of closing arguments, jury instructions, and the verdict) about a discrepancy between K.M.'s account of deleting text messages and a police report. Miller claimed trial counsel had advised him not to testify based on Miller's criminal history.

The Commonwealth called trial counsel in rebuttal at Miller's first PCRA hearing. Trial counsel testified that Miller "never stopped e-mailing" him. He noted that he had reviewed certain text messages from the case with Miller, "trying to impress upon him how bad his case was" for purposes of negotiating an agreement. Trial counsel testified that he thought it was important for Miller to testify, which is why he saw him in person in October. However, trial counsel recalled that Miller did not want to testify. Furthermore, he stated that Miller was unwilling to review the text messages with him. Trial counsel testified that Miller's sister said she would not be a character witness. Finally, trial counsel observed that when Miller brought up the issue of text messages being deleted, both sides had already rested.

Trial counsel recalled that he talked to Miller only about the case and any plea offers. Trial counsel and Miller "did talk about the text messages a

lot because to [counsel,] that was the vital part of the case that there was no surmounting that evidence." Trial counsel recognized the importance of the text message evidence but said that Miller "would never answer to them." He summarized that "there really wasn't a great defense strategy" other than to assert that the relationship was limited to sexual text messages.

The PCRA court dismissed Miller's petition. Miller appealed and retained another PCRA attorney, who alleged that prior PCRA counsel was ineffective and that the PCRA court erred in finding trial counsel effective. Miller then retained present PCRA counsel on appeal, who alleged six counts of ineffective assistance of prior PCRA counsel. We remanded for an evidentiary hearing based on the first five claims: three concerning the text messages between May and July 2016, one concerning impeaching trial counsel's testimony that Miller did not want to testify or meet in person, and one concerning character witnesses for Miller's reputation for chastity with teenage females. *Commonwealth v. Miller*, 292 A.3d 1121 (Table), 2023 WL 395122 (Pa. Super. 2023) (non-precedential decision).

The PCRA court heard the case on remand on August 22, 2023, and March 7, 2024. Miller, Miller's sister, prior PCRA counsel, and trial counsel testified. Notably, Miller introduced e-mails and phone records cataloguing the history of his contact with trial counsel. After briefing, the PCRA court dismissed Miller's petition.

Miller appealed. Miller and the PCRA court complied with Pennsylvania Rule of Appellate Procedure 1925.

Miller presents five issues for review:

A. Whether the PCRA court erred in, without citation to case law, finding both PCRA counsel and trial counsel effective in failing to present character evidence that Miller had a reputation in the community of chaste behavior with underage females?

B. Whether the PCRA court erred in, without citation to case law, making negative credibility determinations concerning Miller's stipulated character witnesses where the Court did not view or listen to the witnesses testify?

C. Whether the PCRA court erred in, without citation to case law, finding that it would have been absurd to present character evidence in a sex offense case, where the defendant proffered no other defense, because the character witnesses could have been cross-examined with text message evidence that was already introduced?

D. Whether the PCRA court erred in finding [prior] PCRA counsel effective in declining to raise trial counsel's ineffectiveness for failing to allege a discovery violation by the Commonwealth for failing to turn over messages between K.M. and Miller from May 2016 through July 2016 and seeking a spoliation instruction?

E. Whether the PCRA court erred in finding trial counsel credible based on its prior ruling and previous testimony that trial counsel had provided before he was impeached with e-mail communications and phone records which established that trial counsel did not have phone conversations with Miller and counsel lied under oath when he claimed that he begged Miller to meet with him where it was Miller who scheduled the meeting with trial counsel and numerous inconsistencies existed in trial counsel's testimony?

Miller's Brief at 7.

On appeal from the denial of a PCRA petition, this Court must review "whether the determination of the PCRA court is supported by the evidence of record and is free of legal error." **Commonwealth v. Bishop**, 266 A.3d 56, 62 (Pa. Super. 2021) (quoting **Commonwealth v. Hand**, 252 A.3d 1159,

- 12 -

1165 (Pa. Super. 2021)).  We will not disturb the findings of the PCRA court "unless there is no support for the findings in the certified record." *Id.*

A PCRA petitioner may obtain relief by pleading and proving, *inter alia*, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place."  42 Pa.C.S. § 9543(a)(2)(ii); *see Commonwealth v. Brown*, 196 A.3d 130, 150 (Pa. 2018).  We employ a three-prong standard for a claim of ineffectiveness, under which a petitioner must show: "(1) that the underlying claim has arguable merit; (2) that no reasonable basis existed for counsel's actions or failure to act; and (3) that the petitioner suffered prejudice as a result of counsel's error." *Commonwealth v. Johnson*, 139 A.3d 1257, 1272 (Pa. 2016) (citing *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117 (Pa. 2012)).

The failure to satisfy any one prong is dispositive. *Brown*, 196 A.3d at 151.  "Regarding the prejudice prong, a petitioner must demonstrate that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction." *Johnson*, 139 A.3d at 1272 (citing *Commonwealth v. Dennis*, 950 A.2d 945, 954 (Pa. 2008)).  For a "layered" claim of ineffectiveness, a petitioner must plead and prove each prong "relevant to each layer of representation." *Commonwealth v. Parrish*, 273 A.3d 989, 1003 n.11 (Pa. 2022) (citing *Commonwealth v. McGill*, 832 A.2d 1014, 1022–23 (Pa. 2003)).

- 13 -

Miller's first three appellate issues concern the failure to present witnesses to testify about his character, specifically Miller's reputation in the community of chaste behavior with underage females. First, Miller argues that he proved all three prongs of ineffectiveness regarding this claim. He asserts his layered claim has arguable merit because calling any character witnesses as to his pertinent trait could have swayed the jury (and PCRA court) that he was not guilty. There was no reasonable trial strategy, he contends, because the "bad character evidence" available to challenge the witnesses on cross-examination was "simply a restatement of evidence already adduced at trial." *Commonwealth v. Garrick*, 2016 WL 7148749, 2016 Pa. Super. Unpub. LEXIS 4450 (Pa. Super. Dec. 7, 2016) (non-reported decision).[2] Furthermore, Miller asserts that both attorneys' failure to call character witnesses led to prejudice: his claim was dismissed after prior PCRA counsel failed to call any character witnesses, and character evidence alone at trial "may be sufficient to raise a reasonable doubt and thus justify an acquittal." *Commonwealth v. Morgan*, 739 A.2d 1033, 1037 (Pa. 1999).

Miller's second and third issues highlight particular perceived flaws in the PCRA court's reasoning. Miller challenges the PCRA court's rejection of his stipulated character witnesses without citing case law or observing any of the

---

[2] Miller asserts without citation that the appellate rules' limitation on citing non-precedential memoranda "is constitutionally dubious." *See* Pa.R.A.P. 126(b). He recognizes that *Garrick* was filed before 2019; however, he notes that Rule 126(b) does not apply at the trial court level, and the PCRA court cited only *Garrick* related to his character evidence issue.

eight witnesses testify. He contends the PCRA court's conclusion—presenting character witnesses would be "absurd"—is plainly erroneous, based on the persuasive value of character evidence.

The PCRA court rejected Miller's character evidence claim, concluding first that it did not believe any of the eight witnesses who provided affidavits "engaged in conversation with others in the community where it was noted that [Miller] was so well thought of for not engaging in sexual relations with underage girls." PCRA Court Opinion, 10/28/24, at 7–8. Furthermore, the PCRA court reasoned that trial counsel and prior PCRA counsel both had reasonable strategies not to present witnesses to Miller's character for chastity, given the sexually explicit text messages in evidence. *Id.* at 8. The court credited prior PCRA counsel's rationale:

> I couldn't imagine that had been in [Miller's] best interest just based on the nature of the text messages. I envisioned cross examination being -- if I was a prosecutor, I would have used the text messages where he was talking about his putting his penis inside of her multiple times, multiple different ways as cross examination to those witnesses if they would come in for that. And I did not think that highlighting that again would have been reasonable or -- at all.

N.T., 3/7/24, at 10.

Based on the articulated concerns of both prior counsel, the PCRA court could "not fathom any argument, considering the facts of this case, that it is unreasonable to not have presented character testimony of [Miller's] chasteness with underage females." PCRA Court Opinion, 10/28/24, at 9. The court observed that Miller's text messages would "obliterate" any notion that

- 15 -

Miller had a reputation for chastity. *Id.* at 10. Based on the messages, the PCRA court opined that Miller's proffered strategy would be *un*reasonable:

> "The thought that a trial lawyer, tasked with advancing the best interests of his or her client, would parade eight witnesses into court to claim that [Miller] had a reputation in the community for being chaste with underage females only to be, one after the other, confronted with the volume of sexually explicit text messages between [Miller] and the victim in this very case, strikes us as absurd.

*Id.* at 11. Finally, the PCRA court concluded that Miller suffered no prejudice from his attorneys' reasonable decisions not to present character evidence of his chasteness with underage females. *Id.*

We agree with the PCRA court's conclusion. Certainly, evidence of the character of a defendant can be powerful and persuasive. ***Commonwealth v. Hull***, 982 A.2d 1020, 1023 (Pa. Super. 2009). Thus, in a case where the only direct witnesses are the alleged victim and the defendant, defense counsel can be ineffective for failing to investigate or call witnesses to testify to the defendant's good character. ***Id.*** (citing ***Commonwealth v. Weiss***, 606 A.2d 439 (Pa. 1992)). Where the defendant is accused of sexual crimes, his chastity would naturally be a "pertinent trait" for which character evidence is admissible. Pa.R.E. 404(a)(2)(A).

Here, however, voluminous text message records supplemented K.M.'s testimony. This was not a case where the victim's uncorroborated testimony comprised the Commonwealth's entire case. Instead, in numerous text messages before the incident, Miller described explicit sexual acts that he would carry out with K.M. Because the sexually charged messages would call

Miller's reputation for chasteness with underage females into question, they would be fuel for cross-examination. The problem is not, as in ***Garrick***, that the text messages were "already adduced at trial" but that they so directly negate any notion that Miller would act consistently with a chaste character with K.M. Trial counsel and prior PCRA counsel recognized the centrality of the text messages to the Commonwealth's case against Miller for precisely this reason. We agree with the PCRA court that avoiding additional presentation of the text messages was part of a reasonable trial strategy and that, based on the body of evidence in this case, the proposed character testimony would not have advanced Miller's interests. Based on this analysis, the PCRA court's credibility determinations of Miller's stipulated witnesses were at most harmless. Miller's first three issues fail.

Miller's fourth issue concerns counsel's stewardship regarding the text messages between K.M. and him from May 2016 to July 2016. K.M. testified that she deleted those messages before giving her grandmother Sandy her phone in July 2016. However, a police report indicated that the messages were available on K.M.'s phone when Detective Tarasi searched it on January 10, 2017:

> Upon conclusion of the interview I met with Sandy M[.] and explained the need for [K.M.'s] phone. Sandy stated that she paid for the phone and that [K.M.] expected that I would. [K.M.] told Sandy she had saved all of the messages from her and Joe to include the inappropriate pictures. Sandy did sign a consent to search form for me and I took the phone. [K.M.] was more than cooperative and understanding and provided her pass code to get into the phone.

> Upon return to the station I began to peruse the text message thread between Joe and [K.M.]  It [sic] extremely long and **dated back to May of 2016**.  Through the texts I was able to glean that Joe acknowledged that [K.M.] was a relative and 15 years old, he had two sons, and he drives a green Dodge pick up truck.

Miller's PCRA Exhibit 1, at 5 (emphasis added).  At the PCRA hearing, trial counsel agreed that K.M. "had at least told the police that she saved" the messages.

Miller argues that PCRA counsel was ineffective for failing to challenge trial counsel's effectiveness in failing to allege a discovery violation or seek an instruction on spoliation.  Miller contends that the missing messages would show, contrary to K.M.'s testimony, that it was K.M. who initiated the sexual conversations.  Trial counsel, he argues, confused the text messages with the Facebook messages, and should have impeached K.M.

The PCRA court observed a factual dispute as to the meaning of the bolded statement in the police report above.  The Commonwealth suggested that the "text message thread" included the Facebook messages between Miller and K.M., which were not deleted and were provided in discovery.  The PCRA court found that Miller did not meet his burden to prove that evidence was withheld or suppressed.[3]

> We understand the difference between text messages and Facebook messages from technological and branding standpoints. We are not confident, however, that regular people do not use the terms interchangeably or use the term "text" as a generalized description of electronic messages other than e-mail.  Mindful of

---

[3] The PCRA court first analyzed this issue under the framework of **Brady v. Maryland**, 373 U.S. 83 (1963), and then as a discovery/spoliation issue.  The question of the meaning of the police report applies to both.

the burden upon [Miller as the party claiming a violation], we are also persuaded by Commonwealth's argument that [Miller] could have presented the testimony of the police officer who created the report stating that [she] had reviewed a "text message thread" to provide clarification. For that matter, [Miller] could have also subpoenaed [K.M.] to testify to this point at the PCRA hearing. Accordingly, we do not find that [Miller] has proven the existence of text messages that were withheld or suppressed.

PCRA Court Opinion, 10/28/24, at 13.

Miller counters that K.M. was clear in distinguishing text messages from Facebook messages. At trial, K.M. stated that Facebook was "a social media app," and that she and Miller "Messengered" each other on Facebook; she also agreed that she later communicated by cell phone, to the number Miller gave her. N.T., 2/12/20–2/14/20, at 39–40, 48.

We agree that K.M. appreciated the difference between text messages and Facebook messages. However, K.M. was not the author of the police report. It was Detective Tarasi who wrote that she reviewed the "text message thread" dating back to May of 2016. Miller provided no evidence, and we have found none, that Detective Tarasi regarded text messages and Facebook messages differently.[4]

---

[4] Earlier in her report, Detective Tarasi summarized an interview of K.M.:

During the interview [K.M.] disclosed that she and Joe Miller became friends on Facebook after he "friend requested" her. They spoke for several months normally and then the dialogue turned sexual. Joe had sent "dick pics" via text message and asked for sexual pictures as well, however [K.M.] would not send any.

Miller's PCRA Exhibit 1, at 4. This contradicts K.M.'s testimony that Miller sent sexual messages the first day he talked with her. However, it does not resolve

*(Footnote Continued Next Page)*

- 19 -

Because Miller did not prove that the police (and the Commonwealth) ever had access to the *text* messages from May to July of 2016, his claim lacks arguable merit. As further support, we observe that Detective Tarasi wrote that she perused the "text message thread" on January 10, 2017. Detective Tarasi testified at trial that after K.M. and her grandmother provided consent to search her phone, "that's the same phone that was then turned over to the Attorney General's office and Agent Soop then examined." *Id.* at 156. Agent Soop's report, consistent with K.M.'s testimony, provided that the text messages started on July 26, 2016. *Id.* at 135, 173. Agent Soop explained that none of the text messages in the report were deleted:

> Q. Okay. In terms of those [3486 text messages], are there message that are known as being deleted messages versus nondeleted messages?
>
> A. None of these messages in this report reflect that they were deleted. The Apple phones -- and this was an Apple phone -- is kind of a unique animal, too, in that depending on what you're using, your ability to recover deleted data can be more difficult on an Apple device.
>
> The tool used here was Cellebrite, which generally would recover some deleted items from an iPhone. None of them in this report reflect that they were deleted, though.

*Id.* at 132–33. We do not read Agent Soop's testimony to reflect that the Commonwealth had the ability to recover the deleted text messages. Rather, his report contained all the text messages available to the Commonwealth,

---

whether the "text message thread" Detective Tarasi stated she read included Facebook messages, a threshold issue for Miller's discovery-based claim.

which were provided to the defense. Since Miller did not show that the Commonwealth ever had possession of the deleted text messages, Miller's discovery/spoliation claim lacks arguable merit, and his fourth issue fails.

Miller's fifth issue concerns the PCRA court's finding that trial counsel testified credibly. At the first PCRA hearing, trial counsel testified that Miller never requested in-person meetings and wanted to meet only over the phone, that trial counsel informed Miller the only way to prevail at trial was for Miller to testify, but Miller did not want to testify, and that Miller was not willing to review the text messages with him. The PCRA court found trial counsel credible. On remand, Miller presented phone and e-mail records to trial counsel, confronting him about how the e-mails did not contain advice that Miller had to testify or show Miller's unwillingness to read the text messages or to testify. Contrary to trial counsel's testimony, e-mail records showed that it was Miller who scheduled the second in-person meeting with trial counsel. Miller himself testified, corroborated with his phone bills, that he had no phone contact with trial counsel until trial. Additionally, Miller's sister contradicted trial counsel's testimony that she refused his request to testify as a character witness. However, the PCRA court continued to find trial counsel credible in its analysis.

Miller argues that the PCRA court erred by finding trial counsel credible despite his impeachment evidence. He contends that the evidentiary record does not support this determination, or the resulting factual findings regarding trial preparation and strategy. Miller layers a claim that prior PCRA counsel was ineffective for failing to impeach trial counsel with the e-mail and phone records.

A reviewing court affords "great deference" to the determinations of credibility made by a PCRA court. **Commonwealth v. Johnson**, 966 A.2d 523, 539 (Pa. 2009). Like any factual findings, the PCRA court's credibility determinations are binding if the record supports them. **Commonwealth v. Hereford**, 334 A.3d 903, 909–10 (Pa. Super. 2025) (*en banc*).

Here, the PCRA court observed trial counsel testify in the first PCRA hearing and again on remand. Trial counsel agreed with Miller that the e-mail records did not include trial counsel's advice (or begging) to testify or reflect Miller's distaste for in-person meetings. However, the PCRA court observed that the e-mails "also do not explicitly support [Miller's] version of events." PCRA Court Opinion, 10/28/24, at 20–21. The same holds for the PCRA court's resolution of conflicts in testimony such as whether Miller's sister refused trial counsel's request to testify as a character witness. Because trial counsel's own testimony is direct evidence of his narrative, the record supports the PCRA court's acceptance of that testimony. Miller's fifth issue fails.

Order affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/16/2025